

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

CHARLES AUSTIN, Individually and On   :
Behalf of All Others Similarly Situated,   :
                          :

       Plaintiff,            :

       vs.                 :

AETERNA ZENTARIS INC., JÜERGEN   :
ENGEL and DENNIS TURPIN       :
                          :

       Defendants.        :

-------------------------------------------------------X

Civil Action No:

CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

**JURY TRIAL DEMANDED**

The allegations in this Complaint are based upon Plaintiff's personal knowledge as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including, without limitation, a review and analysis of United States Securities and Exchange Commission ("SEC") filings by AEterna Zentaris Inc. ("AEterna" or the "Company"), as well as press releases, analyst reports, court filings, public statements, news articles and other publications disseminated by or concerning AEterna and the other defendants named herein (together with AEterna, the "Defendants"). Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiff believes that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of investors who purchased or otherwise acquired AEterna securities in the United States or on the NASDAQ Global Market ("NASDAQ GM") between February 3, 2010 and April 1, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2. AEterna is a late-stage biopharmaceutical company that designs and develops the drug perifosine to treat various types of cancers.

3. Throughout the Class Period, Defendants misled investors about the timing and success of the AEterna's clinical trial that tested whether perifosine was effective in treating late stage colorectal cancer. As a result, AEterna's stock traded at artificially inflated prices during the Class Period, reaching a high of $2.68 on April 29, 2011.

1

4.     After the truth regarding perifosine's inability to treat colorectal cancer was disclosed to the public, unsuspecting investors watched the price of AEterna's common stock drop to $0.73 on April 2, 2012, a decline of approximately 73% from the class period high.

5.     Through this action, Plaintiff seeks to recover for himself and absent Class members the devastating losses that were suffered as a result of the Company's and its officers' fraud.

## JURISDICTION AND VENUE

6.     This action arises under Sections 10(b) and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78(t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

7.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

10.     Plaintiff Charles Austin, as set forth in the accompanying certification and incorporated by reference herein, purchased AEterna securities at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant AEterna is headquartered in Quebec City, Canada.  The Company is engaged in the discovery, development and commercialization of drugs for oncology and endocrine therapy primarily in the United States, Switzerland and Japan.  The Company has common stock listed on the NASDAQ GM, which trades under the ticker symbol "AEZS."

12.     Defendant Jürgen Engel ("Engel") is and was, at all relevant times, the Company's President, Chief Executive Officer and Director.

13.     Defendant Dennis Turpin ("Turpin") is and was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer.

14.     Engel and Turpin are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their position with the Company, had the authority to control and correct the contents of AEterna's public disclosures to the market.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") consisting of all persons who purchased or otherwise acquired AEterna securities in the United States or on the NASDAQ GM during the Class Period at artificially inflated prices and who suffered damages as a result. Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

16.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members remains unknown at

this time, Plaintiff believes that there are hundreds of members of the Class.  Record owners and

Class members can be identified from records maintained by AEterna, or its transfer agent, and

can be notified of the pendency of this action by mail and publication, using forms of notice

similar to those customarily used in securities class actions.

17.     Plaintiff's claims are typical of the other members of the Class because Plaintiff

and all of the Class members sustained damages that arose out of the Defendants' unlawful

conduct complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the

Class, and Plaintiff has no interests that are contrary to, or in conflict with, the interests of the

Class members that he seeks to represent.  Plaintiff has retained competent counsel experienced

in class action litigation under the federal securities laws to ensure such protection and intends to

prosecute this action vigorously.

19.     A class action is superior to other methods for the fair and efficient adjudication

of this controversy since joinder of all members of the Class is impracticable.  Furthermore, as

the damages suffered by individual members of the Class may be relatively small, the expense

and burden of individual litigation make it impossible for members of the Class to individually

seek redress for wrongs done to them.  There will be no difficulty in the management of this

action as a class action.

20.     The prosecution of separate actions by individual Class members would create a

risk of inconsistent and varying adjudications, which could establish incompatible standards of

conduct for Defendants.  Questions of law and fact common to members of the Class

predominate over any questions that may affect only individual members, in that Defendants

have acted on grounds generally applicable to the entire Class.  The questions of law and fact

common to the Class include, but are not limited to, the following:

> a.  whether Defendants' acts violated the federal securities laws as alleged herein;
>
> b.  whether Defendants' publicly disseminated statements during the Class Period omitted and/or misrepresented material facts;
>
> c.  whether Defendants acted with scienter in omitting and/or misrepresenting material facts;
>
> d.  whether the price of AEterna securities was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;
>
> e.  whether the Individual Defendants were controlling person as alleged herein; and
>
> f.  whether members of the Class have sustained damages and, if so, the proper measure of such damages.

## BACKGROUND

21.     According to AEterna, perifosine is "a novel anticancer agent that modulates

several key signal transduction pathways, including Akt, MAPK, and JNK that have been shown

to be critical for the survival of cancer cells."  On June 1, 2009, the Company announced that its

partner Keryx Biopharmaceuticals, Inc. ("Keryx") presented positive Food and Drug

Administration ("FDA") Phase 2 trial data on the clinical activity of perifosine as a treatment for

advanced metastatic colon cancer and advanced renal cell carcinoma.[1]

## SUBSTANTIVE ALLEGATIONS

22.     The Class Period begins on February 3, 2010, when AEterna announced a special

protocol assessment agreement with the FDA to conduct a Phase 3 trial of perifosine in the

---

[1]   Although AEterna owns the rights to perifosine, the Company licenses the drug to Keryx in North America.

treatment of patients with refractory metastatic colorectal cancer.  The press release stated, in relevant part, the following:

**February 3, 2010**

**Æterna Zentaris Partner Keryx Announces Special Protocol Assessment Agreement with FDA for Phase 3 Trial of Perifosine (KRX-0401) in the Treatment of Patients with Refractory Metastatic Colorectal Cancer**

Phase 3 X-PECT Trial (Xeloda® + Perifosine Evaluation in Colorectal cancer Treatment) to be led by Dr. Johanna Bendell, Director, GI Oncology Research, Sarah Cannon Research Institute

**Québec City, Canada, February 3, 2010** - Æterna Zentaris Inc. (Nasdaq: AEZS; TSX: AEZ) (the "Company"), a late-stage drug development company specialized in oncology and endocrinology, today announced that its partner, Keryx Biopharmaceuticals (Nasdaq: KERX), has reached an agreement with the U.S. Food and Drug Administration (FDA) regarding a Special Protocol Assessment (SPA) on the design of a Phase 3 trial for its PI3K/Akt pathway inhibitor, perifosine (KRX-0401), in patients with refractory metastatic colorectal cancer. The SPA provides agreement that the Phase 3 study design adequately addresses objectives in support of a regulatory submission. Keryx is Æterna Zentaris' partner and licensee for perifosine in the United States, Canada and Mexico. Perifosine is also out-licensed to Handok in South Korea while Æterna Zentaris retains rights for the rest of the world.

**About the Phase 3 Trial Design**

The Phase 3 X-PECT (Xeloda® + Perifosine Evaluation in Colorectal cancer Treatment) trial will be a randomized (1:1), double-blind trial comparing the efficacy and safety of perifosine + capecitabine (capecitabine is a chemotherapy marketed by Roche as Xeloda®) vs. placebo + capecitabine in approximately 430 patients with refractory metastatic colorectal cancer. Patients must have failed available therapy including 5-fluorouracil (5-FU), oxaliplatin (Eloxatin®), irinotecan, bevacizumab (Avastin®) and, if K-Ras wild-type (WT), failed therapy with prior cetuximab (Erbitux®) or panitumumab (Vectibix®). For oxaliplatin-based therapy, failure of therapy will also include patients who discontinued due to toxicity. The primary endpoint is overall survival (OS), with secondary endpoints including overall response rate (ORR: complete responses + partial responses), progression-free survival (PFS) and safety. The median OS for the X-PECT study's targeted patient population which has failed prior therapies as described above, is approximately 5 months. The X-PECT study will be powered at 90% to detect a statistically significant difference in OS, with an assumed median OS for the control arm of 5-6 months and 7-8 months for the perifosine arm. Approximately 360 events of death will trigger the un-blinding of the study.

Approximately 40 to 50 U.S. sites will participate in the study. The study is expected to begin in 2Q 2010, and enrollment is expected to take approximately 12 months, with study completion expected in 2H 2011. Dr. Johanna Bendell, Director of GI Oncology Research for the Sarah Cannon Research Institute, Nashville, Tennessee, will lead the Phase 3 investigational team that includes Dr. Cathy Eng, Associate Medical Director for the Colorectal Center at MD Anderson Cancer Center in Houston, Texas.

23.     The aforementioned statements in ¶ 22 were false and/or materially misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-PECT study would be completed later than the second half of 2011 even if perifosine was ineffective in meeting the primary endpoint of extending overall survival.

24.     On February 23, 2010, AEterna filed with the SEC a short form base shelf prospectus on Form F-3 with the SEC in order to issue up to $60 million of the Company's common shares and/or warrants.  On March 12, 2010, AEterna filed with the SEC an amended short form base shelf prospectus on Form F-3 ("March 2010 Shelf Prospectus").  The March 2010 Shelf Prospectus became effective on March 16, 2010.

25.     On April 5, 2010, AEterna announced that the Phase 3 X-PECT trial received FDA fast track designation.  The press release stated, in relevant part, the following:

**April 5, 2010**

**Æterna Zentaris Announces Perifosine Receives FDA Fast Track Designation for the Treatment of Refractory Advanced Colorectal Cancer**

**Quebec City, Canada, Monday, April 5, 2010** - Æterna Zentaris Inc. (NASDAQ: AEZS, TSX: AEZ) (the "Company"), a late-stage drug development company specialized in oncology and endocrine therapy, today announced that its partner, Keryx Biopharmaceuticals (Nasdaq: KERX), was granted Fast Track designation by the U.S. Food and Drug Administration ("FDA") for perifosine (KRX-0401), the Company's novel, potentially first-in-class, oral anti-cancer agent that inhibits the phosphoinositide 3 kinase (PI3K)/Akt pathway, for the treatment of refractory advanced colorectal cancer. Keryx is Æterna Zentaris' partner and licensee for perifosine in the United States, Canada and Mexico. Æterna Zentaris has also out-licensed perifosine to Handok in South Korea while retaining rights for the rest of the world.

The Fast Track program of the FDA is designed to facilitate the development and

expedite the review of new drugs that are intended to treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs. Fast Track designated drugs ordinarily qualify for priority review, thereby expediting the FDA review process.

A randomized, double-blind Phase 3 trial investigating perifosine in combination with capecitabine (Xeloda(R)) versus placebo in combination with capecitabine (Xeloda(R)) in patients with refractory metastatic colorectal cancer is expected to commence this quarter under a Special Protocol Assessment (SPA) with the FDA.

Juergen Engel, Ph.D., President and Chief Executive Officer of Æterna Zentaris, commented, "We now look forward to the initiation and sponsorship by our partner, Keryx, of this key registration Phase 3 trial in refractory metastatic colorectal cancer in North America which they expect to complete in 2011, with product launch, in the USA, in 2012. These data will be very supportive of our efforts to register perifosine in the rest of the world, and in some countries, we expect they will be sufficient to do so without any additional studies."

26.     Subsequently, on April 8, 2010, the Phase 3 X-PECT trial was initiated.  The

press release announcing the launch of the study stated, in relevant part, the following:

**April 8, 2010**

**Æterna Zentaris Announces Initiation of Phase 3 Registration Trial with Perifosine in Refractory Advanced Colorectal Cancer**

**Phase 3 X-PECT Trial (Xeloda®) + Perifosine Evaluation in Colorectal Cancer Treatment) being conducted by partner Keryx Biopharmaceuticals pursuant to Special Protocol Assessment with the Food and Drug Administration**

**Quebec City, Canada, Thursday, April 8, 2010** - Æterna Zentaris Inc. (NASDAQ: AEZS, TSX: AEZ) (the "Company"), a late-stage drug development company specialized in oncology and endocrine therapy, today announced the initiation of a Phase 3 registration clinical trial with perifosine (KRX 0401) ), the Company's novel, potentially first-in-class, oral anti-cancer agent that inhibits Akt activation in the phosphoinositide 3 kinase (PI3K) pathway, for the treatment of refractory advanced colorectal cancer. The trial is sponsored and conducted by Keryx Biopharmaceuticals ("Keryx") (Nasdaq: KERX), Æterna Zentaris' partner and licensee for perifosine in the United States, Canada and Mexico. Æterna Zentaris has also out-licensed perifosine to Handok in South Korea, while retaining rights for the rest of the world.

The Phase 3 trial, entitled "X-PECT (*Xeloda® + Perifosine Evaluation in Colorectal cancer Treatment*) trial", is being conducted pursuant to a Special Protocol Assessment ("SPA") with the Food and Drug Administration. Perifosine has also been granted Fast Track designation for the treatment of refractory advanced colorectal cancer.

8

Approximately 40 to 50 U.S. sites will participate in the study. Keryx expects enrollment to take approximately 12 - 14 months, with study completion expected in the second half of 2011.

27.   The aforementioned statements in ¶¶ 25 - 26 were false and/or materially misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-PECT study would be completed later than the second half of 2011 even if perifosine was ineffective in meeting the primary endpoint of extending overall survival.

28.   On April 16, 2010, the Company filed with the SEC a supplemental prospectus ("Prospectus Supplement No. 1") to the March 2010 Shelf Prospectus to sell 11,111,111 units of company securities.  One unit was priced at $1.35 and was comprised of one common shares and a warrant to purchase 0.40 of a common share.  AEterna announced on April 20, 2010 that the offering pursuant to Prospectus Supplement No. 1 raised $13.7 million for the Company.

29.   On May 13, 2010, the Company filed a Form 6-K ("May 2010 6-K") with the SEC announcing its financial results for the first fiscal quarter ending March 31, 2010.  On a conference call discussing the results, Defendant Engel stated, in relevant part, the following:

> In April, a registration Phase 3 trial of perifosine, our lead oral anti-cancer compound, entitled X-PECT, was initiated in advanced colorectal cancer under a special protocol assessment granted by the FDA which had earlier granted fast track designation for the same indication. This randomized one-to-one double-blind trial comparing the efficacy and safety of perifosine plus capecitabine Xeloda versus placebo plus capecitabine. It was approximately 430 patients in 40 to 50 sites in the US. The primary end point is overall survival with secondary endpoints including overall response rate, complete and partial responses, progression free survival and safety. The trial is sponsored and conducted by Keryx Biopharmaceuticals, our partner and licensee for perifosine in the United States, Canada and Mexico. Keryx expects the trial to be completed in the second half of 2011.

30.   The aforementioned statement in ¶ 29 was false and/or materially misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-PECT study would be completed later than the second half of 2011 even if perifosine was ineffective in meeting the primary endpoint of extending overall survival.

31.     On June 8, 2010, AEterna presented at the American Society of Clinical Oncology ("ASCO") Annual Meeting the results for the Phase 2 study of perifosine and capecitabine in the treatment of advanced metastatic colorectal cancer. Specifically, the Company reported that patients receiving perifosine and capecitabine demonstrated a significant improvement in overall survival, as opposed to those patients receiving a placebo and capecitabine.

32.     On June 16, 2010, the Company filed with the SEC a second supplemental prospectus ("Prospectus Supplement No. 2") to the March 2010 Shelf Prospectus to sell 8,805,964 units of company securities. One unit was priced at $1.3725 and was comprised of one common shares and a warrant to purchase 0.50 of a common share. AEterna announced on June 21, 2010 that the offering pursuant to Prospectus Supplement No. 2 raised $12 million for the Company.

33.     On June 29, 2010, AEterna announced that it received positive scientific advice from the European Medicines Agency ("EMA") regarding the Phase 3 X-PECT trial.

34.     On July 1, 2010, AEterna filed with the SEC a short form base shelf prospectus on Form F-10 with the SEC in order to issue up to $85 million of the Company's common shares and/or warrants. On July 15, 2010, AEterna filed with the SEC an amended short form base shelf prospectus on Form F-10 ("July 2010 Shelf Prospectus"). The July 2010 Shelf Prospectus became effective on July 21, 2010.

35.     On August 12, 2010, the Company filed a Form 6-K ("August 2010 6-K") with the SEC announcing its financial results for the second fiscal quarter ending June 30, 2010. The August 2010 6-K stated, in relevant part, the following:

> On April 8, 2010, our partner, Keryx announced the initiation of a Phase 3 registration trial with perifosine in refractory advanced colorectal cancer. The Phase 3 trial is being

conducted pursuant to a SPA with the FDA. Approximately 40 to 50 U.S. sites will participate in the study. Keryx expects enrollment to take approximately 12 to 14 months, with study results expected in the second half of 2011.

*  *  *  *  *  *

**Outlook for 2010**

**Perifosine**

We expect to continue the development of perifosine in collaboration with our partner, Keryx, who is responsible, in accordance with the terms of our license agreement, for the development and registration of perifosine in North America. We have access to all corresponding data at no additional cost; hence, we expect to benefit from current development activities in order to achieve registration in territories excluding North America.

Our primary focus will be on the advancement of the ongoing Phase 3 registration studies in both multiple myeloma and refractory metastatic colorectal cancer, in conformity with the SPA recently received by Keryx from the FDA. Furthermore, we have obtained positive scientific advice from the EMA relative to a development and regulatory pathway so as to extend the reach of perifosine to European territories for the multiple myeloma and the refractory metastatic colorectal cancer indications. Consequently, we are not expecting to invest in any additional trials in Europe in multiple myeloma or refractory metastatic colon cancer, since the EMA does not require that any studies be performed in addition to the studies currently in progress.

We also expect to establish a registration strategy that will enable us to benefit from the Asian markets and from other attractive territories.

36.  The August 2010 6-K was also certified by Defendants Engel and Turpin, whom

respectively attested to the following:

1. ***Review:*** I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Aeterna Zentaris Inc. (the "issuer") for the interim period ended June 30, 2010.

2. ***No misrepresentations:*** Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3. ***Fair presentation:*** Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the

11

interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4. *Responsibility:* The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR"), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5. *Design:* Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer and I have, as at the end of the period covered by the interim filings

    (a) designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

        (i) material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

        (ii) information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

    (b) designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 *Control framework:* The control framework the issuer's other certifying officer and I used to design the issuer's ICFR is *Internal Control — Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

5.3 *N/A*

5.3 *N/A*

6. *Reporting changes in ICFR:* The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2011 and ended on March 31, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

    37.     On a conference call discussing the results for the second fiscal quarter ending

June 30, 2010, Defendant Engel stated, in relevant part, the following:

In April a Phase III registration trial of perifosine entitled X-PECT (Xeloda(R)+Perifosine Evaluation in Colorectal cancer Treatment. Trial was initiated in advancement of study colorectal cancer under special protocol assessment granted by the FDA. In June the EMA issued a positive scientific advice for this trial, meaning that this ongoing trial is expected to be sufficient for registration in Europe without additional clinical studies, as it is also the case in the US. This randomized one to one double-blind trial comparing the efficacy and safety of perifosine plus capecitabine versus placebo and capecitabine involves approximately 430 patients in 40 to 50 sites in the US. 363 events will trigger the unblinding of the trial. The primary endpoint is overall survival. The trial is sponsored and conducted by Keryx BioPharmaceuticals, our partner and licensee for perifosine in the United States, Canada and Mexico. Keryx expect the trial to be completed in the second half 2011.

*          *          *          *          *          *

[Analyst]: Okay, great, thank you. And again, on perifosine, can you talk – you mentioned that was your focus. Can you talk to the degree of involvement you have the Keryx, with the ongoing Phase III program?

[Defendant Engel]: First of all, as you know that the clinical program is only one part of an NDA, so we are taking care of the C&C part and the final production of the compound and of the whole preclinical part of the NDA. And for the clinical involvement in the Phase III, Paul will continue.

[Paul Burroughs]: I think we have, from our perspective, a very strong and productive relationship with Keryx. It is very harmonious. It is very efficient. They are excellent at setting up and executing their studies. I think we are very good at supporting that, so we're helping them, as Jurgen said, with a lot of the behind the scenes work, a lot of clinical writing. And we have ourselves had quite an experience with perifosine, so it's a good joint effort between Keryx and us.

38.     The aforementioned statements in ¶¶ 35 - 37 were false and/or materially misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-PECT study would be completed later than the second half of 2011 even if perifosine was ineffective in meeting the primary endpoint of extending overall survival.

39.     On November 10, 2010, the Company filed a Form 6-K ("November 2010 6-K") with the SEC announcing its financial results for the third fiscal quarter ending September 30, 2010. On a conference call discussing the results, Defendant Engel stated, in relevant part, the following:

13

In colorectal cancer, an enrollment is expected to be completed in June, 2011, with reporting of top line results in the second half of 2011.

    *         *         *         *         *         *

[Analyst]: Okay. Just a last question. I missed the front end of the call. The timing for the results in the colorectal perifosine in Phase 3? Is that still expected second half of next year?

[Defendant Engel]: That's correct. This was mentioned by Keryx in their conference call last week. It was mentioned that the colorectal cancer, the recruitment will be finished in June 2011, and the top line results will be expected in the second half of 2011.

40.     The aforementioned statements in ¶ 39 were false and/or materially misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-PECT study would be completed later than the second half of 2011 even if perifosine was ineffective in meeting the primary endpoint of extending overall survival.

41.     On February 23, 2011, the Company filed with the SEC a third supplemental prospectus to the March 2010 Shelf Prospectus which announced an "At-The-Market" (ATM) sales agreement to sell up to a maximum of 12,500,000 of the Company's common shares.

42.     On March 22, 2011, the Company filed a Form 6-K ("March 2011 6-K") with the SEC announcing its financial results for the fourth fiscal quarter and full fiscal year ending December 31, 2010. The March 2011 6-K, which was certified by Defendant Turpin, stated, in relevant part, the following:

**Outlook for 2011**

**Perifosine**

We expect to continue the development of perifosine in collaboration with our partner, Keryx, who is responsible, in accordance with the terms of our license agreement, for the development and registration of perifosine in North America. We have access to all corresponding data at no additional cost; hence, we expect to benefit from current development activities in order to achieve registration in territories excluding North America.

14

Our primary focus will be on the advancement of the ongoing Phase 3 registration studies in both refractory advanced colorectal cancer and multiple myeloma, in conformity with the SPA received by Keryx from the FDA. Furthermore, we have obtained positive scientific advice from the EMA relative to a development and regulatory pathway so as to extend the reach of perifosine to European territories for the refractory advanced colorectal cancer and multiple myeloma indications. Consequently, we are not expecting to invest in any additional trials in Europe in refractory advanced colorectal cancer or multiple myeloma, since the EMA does not require that any studies be performed in addition to the studies currently in progress. For the ongoing Phase 3 study in multiple myeloma, we will contribute to the recruitment of patients outside the US and to other aspects of the ongoing study; however, our partner Keryx will reimburse us for most of the corresponding costs.

Additionally, we will advance the preparation of our regulatory filings and our commercialization strategy ex-North America. Further, we will continue to accumulate Phase 1 and 2 results in multiple indications and we expect to initiate, with the collaboration of Keryx, an additional clinical trial in CLL.

43.     On a conference call discussing the results for the fourth fiscal quarter and full

fiscal year ending December 31, 2010, Defendant Engel stated, in relevant part, the following:

Now let me give you more details on some of the highlights for 2010 and the last few months. First perifosine. Our novel oral Akt/PI3K inhibitor is currently in two registration Phase III programs in colorectal cancer and multiple myeloma and is, to our knowledge, the most advanced Akt inhibitor in clinical development. [The trial is] being conducted under a special protocol assessment and ha[s] received fast track designation from the FDA. [The] trial[] ha[s] also received positive scientific advice from the European Medicines Agency, EMA, indicating that data from the current ongoing Phase III program will be sufficient to register perifosine in Europe without additional trials.

I will now start to update you on the ongoing Phase III study (inaudible) in colorectal cancer. The registration Phase III X-PECT trial in advance refractory colorectal cancer is a randomized 1-to-1 double blind study comparing the efficacy and safety of perifosine plus capecitabine versus placebo. X-PECT stands for Xeloda plus perifosine evaluation in colorectal cancer treatment. Capecitabine is a (inaudible) product marketed by Roche with a trade name Xeloda. This product will become generic shortly. The study will involve approximately 430 patients in 60 sites in the US. 360 events will trigger the unblinding of the trial. The primary end point is overall survival. The secondary end point is including oral response rate, progression free survival and safety. Patients enrolled have failed all approved drugs and regiments like (inaudible) and other (inaudible) and if they are (inaudible) type, then they will have failed also in treatment with EGFR antibodies, for instance Erbitus and Vectibix. Enrollment is expected to be completed by the end of June this year and top-line results will be available in the fourth quarter of this year with potential drug approval in the US in 2012.

44.     On May 18, 2011, the Company filed Form 6-K ("May 2011 6-K") with the SEC

announcing its financial results for the first fiscal quarter ending March 31, 2011.  The May 2011

6-K stated, in relevant part, the following:

**Outlook for 2011**

**Perifosine**

We expect to continue the development of perifosine in collaboration with our partner,
Keryx, who is responsible, in accordance with the terms of our license agreement, for the
development and registration of perifosine in North America. We have access to all
corresponding data at no additional cost; hence, we expect to benefit from current
development activities in order to achieve registration in territories excluding North
America.

Our primary focus continues to be on the advancement of the ongoing Phase 3
registration studies in both refractory advanced colorectal cancer and multiple myeloma,
in conformity with the SPA received by Keryx from the FDA. Furthermore, given that we
have obtained positive scientific advice from the EMA relative to a development and
regulatory pathway so as to extend the reach of perifosine to European territories for the
refractory advanced colorectal cancer and multiple myeloma indications, we do not
expect to invest in any additional trials in Europe in refractory advanced colorectal cancer
or multiple myeloma, since the EMA does not require that any studies be performed in
addition to the studies currently in progress. For the ongoing Phase 3 study in multiple
myeloma, we will continue to contribute to the recruitment of patients outside the US and
to other aspects of the ongoing study; however, our partner Keryx will reimburse us for
most of the corresponding costs.

Additionally, we will advance the preparation of our regulatory filings and our
commercialization strategy ex-North America. Further, we will continue to accumulate
Phase 1 and 2 results in multiple indications and we expect to initiate, with the
collaboration of Keryx and our Asian partners, additional clinical trials.

45.     The May 2011 6-K was also certified by Defendants Engel and Turpin, whom

respectively attested to the following:

1. *Review:* I have reviewed the interim financial statements and interim MD&A
(together, the "interim filings") of Aeterna Zentaris Inc. (the "issuer") for the interim
period ended March 31, 2011.

2. *No misrepresentations:* Based on my knowledge, having exercised reasonable
diligence, the interim filings do not contain any untrue statement of a material fact or
omit to state a material fact required to be stated or that is necessary to make a statement

not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3. *Fair presentation:* Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4. *Responsibility:* The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR"), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5. *Design:* Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer and I have, as at the end of the period covered by the interim filings

   A. designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

      I. material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

      II. information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

   B. designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 *Control framework:* The control framework the issuer's other certifying officer and I used to design the issuer's ICFR is *Internal Control — Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission.

5.2 *N/A*

5.3 *N/A*

6. *Reporting changes in ICFR:* The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2011

and ended on March 31, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

46.     On a conference call discussing the results for the first fiscal quarter ending

March 31, 2011, Defendant Engel stated, in relevant part, the following:

> Last month, 2 posters on perifosine were presented at the ASCR's annual meeting in Orlando. The data demonstrated perifosine's anti-cancer activity in several gastric cancer cell lines, and in vivo, as well as its capacity of enhancing the anti-tumor activity of 5-FU, including in 5-FU-resistant cell lines. Results also showed the synergistic effects of perifosine with cytotoxic drugs, including bortezomib and 5-FU. Although pre-clinical, the data provided further validation of the ongoing Phase III trials with perifosine, particular the one in colorectal cancer.

>   *    *    *    *    *    *

> The registration Phase III X-PECT trial, which stands for Xeloda plus perifosine evaluation in colorectal cancer treatment, is a double blind placebo-controlled trial comparing the efficacy and safety of perifosine plus capecitabine, versus capecitabine plus placebo. The study involves approximately 430 patients with advanced refractory colorectal cancer, and is conducted in some 60 sites in the US. 360 events will trigger the unblinding of a trial. The primary endpoint is overall survival. Secondary endpoints include overall response rate, progression-free survival, and safety. The study is powered at 90% to demonstrate 2 months' benefit for overall survival in comparison to placebo.

> Enrollment of more than 300 patients already recruited, is occurring at a very good pace, and is expected to be completed by the end of June this year. The trial is also expected to be completed in the fourth quarter of this year, with potential drug approval in the US in 2012. We also intend to file an application to register perifosine in Europe, in parallel to the US filing. I would also like to remind you that this study is based on very encouraging Phase II data presented at June at ASCO last year, where we showed more than doubling of overall survival compared to placebo.

47.     The aforementioned statements in ¶¶ 42 - 46 were false and/or materially

misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-

PECT study would be completed later than the second half of 2011 even if perifosine was

ineffective in meeting the primary endpoint of extending overall survival.

48.     On June 30, 2011, the Company filed with the SEC a first supplemental prospectus to the July 2010 Shelf Prospectus which announced an "At-The-Market" (ATM) sales agreement to sell up to a maximum of 9,500,000 of the Company's common shares.

49.     On July 27, 2011, the Company announced the completion of patient recruitment for the Phase 3 trial with perifosine in refractory advance colorectal cancer.

50.     On August 11, 2011, the Company filed Form 6-K ("August 2011 6-K") with the SEC announcing its financial results for the second fiscal quarter ending June 30, 2011.  The August 2011 6-K, which was signed by Defendants Engel and Turpin, stated, in relevant part, the following:

**Outlook for 2011**

**Perifosine**

We expect to continue the development of perifosine in collaboration with our partner, Keryx, who is responsible, in accordance with the terms of our license agreement, for the development and registration of perifosine in North America. We have access to all corresponding data at no additional cost; hence, we expect to benefit from current development activities in order to achieve registration in territories excluding North America.

Our primary focus continues to be on the advancement of the ongoing Phase 3 registration studies in both refractory advanced colorectal cancer and multiple myeloma, in conformity with the SPA received by Keryx from the FDA. Furthermore, given that we have obtained positive scientific advice from the EMA relative to a development and regulatory pathway so as to extend the reach of perifosine to European territories for the refractory advanced colorectal cancer and multiple myeloma indications, we do not expect to invest in any additional trials in Europe in refractory advanced colorectal cancer or multiple myeloma, since the EMA does not require that any studies be performed in addition to the studies currently in progress. For the ongoing Phase 3 study in multiple myeloma, we will continue to contribute to the recruitment of patients outside the US and to other aspects of the ongoing study; however, our partner Keryx will reimburse us for most of the corresponding costs.

Additionally, we will advance the preparation of our regulatory filings and our commercialization strategy ex-North America. Further, we will continue to accumulate Phase 1 and 2 results in multiple indications and we expect to initiate, with the collaboration of Keryx and our Asian partners, additional clinical trials.

51.     On a conference call discussing the results for the second quarter ending June 30,

2011, Defendant Engel stated, in relevant part, the following:

> First, regarding Perifosine, our novel oral anti-cancer Akt inhibitor. We would like to congratulate our North American partner, Keryx, and all those involved in completing the recruitment of over 465 patients within a 16 month time line, exceeding the original target of 430 patients. This represents an important step forward to completing the trial. As a reminder, Phase 3 registration X-PECT trial -- which stands for Xeloda-class Perifosine Evaluation in Colorectal Cancer Treatment -- is a double-blind placebo-controlled trial comparing the efficacy and safety of Perifosine plus Xeloda, versus placebo plus Xeloda in patients in with refractory advanced colorectal cancer. The primary endpoint is overall survival.

> The trial is conducted under Special Protocol Assessment, and has received Fast Track designation from the FDA. It has also received positive scientific advice from the European Medicines Agency, indicating that data from the current ongoing Phase 3 trial will be sufficient to [reduce] the Perifosine in Europe without additional trials. This study is being conducted in 65 sites in the US, and 360 events will trigger the unblinding of the data. At this time, a little less than 180 events have occurred, and we expect the 360 event to occur in the fourth quarter of this year.

52.     The August 2011 6-K was also certified by Defendants Engel and Turpin, whom

respectively attested to the following:

> 1. *Review:* I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Aeterna Zentaris Inc. (the "issuer") for the interim period ended March 31, 2011.

> 2. *No misrepresentations:* Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

> 3. *Fair presentation:* Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

> 4. *Responsibility:* The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR"), as those terms are defined in National

20

Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5. **Design:** Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer and I have, as at the end of the period covered by the interim filings

    A. designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

        I. material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

        II. information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

    B. designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 **Control framework:** The control framework the issuer's other certifying officer and I used to design the issuer's ICFR is *Internal Control — Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission.

5.2 *N/A*

5.3 *N/A*

6. **Reporting changes in ICFR:** The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2011 and ended on March 31, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

53.    The aforementioned statements in ¶¶ 50 - 52 were false and/or materially

misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-

PECT study would be completed later than the second half of 2011 even if perifosine was

ineffective in meeting the primary endpoint of extending overall survival.

54.     On November 11, 2011, the Company filed Form 6-K ("November 2011 6-K")

with the SEC announcing its financial results for the third fiscal quarter ending September 30,

2011.  The November 2011 6-K stated, in relevant part, the following:

**Outlook for 2011**
**Perifosine**

We expect to continue the development of perifosine in collaboration with our partner, Keryx, who is responsible, in accordance with the terms of our license agreement, for the development and registration of perifosine in North America. We have access to all corresponding data at no additional cost; hence, we expect to benefit from current development activities in order to achieve registration in territories excluding North America.

Our primary focus continues to be on the advancement of the ongoing Phase 3 registration studies in both refractory advanced colorectal cancer and multiple myeloma, in conformity with the SPA received by Keryx from the FDA. Furthermore, given that we have obtained positive scientific advice from the EMA relative to a development and regulatory pathway so as to extend the reach of perifosine to European territories for the refractory advanced colorectal cancer and multiple myeloma indications, we do not expect to invest in any additional trials in Europe in refractory advanced colorectal cancer or multiple myeloma, since the EMA does not require that any studies be performed in addition to the studies currently in progress. . . .

Additionally, we will advance the preparation of our regulatory filings and our commercialization strategy ex-North America. Further, we will continue to accumulate Phase 1 and 2 results in multiple indications and we expect to initiate, with the collaboration of Keryx and our Asian partners, additional clinical trials

55.     The November 2011 6-K was also certified by Defendants Engel and Turpin,

whom respectively attested to the following:

1. ***Review:*** I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Aeterna Zentaris Inc. (the "issuer") for the interim period ended March 31, 2011.

2. ***No misrepresentations:*** Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3. *Fair presentation:* Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4. *Responsibility:* The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR"), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5. *Design:* Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer and I have, as at the end of the period covered by the interim filings

   A. designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

      I. material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

      II. information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

   B. designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 *Control framework:* The control framework the issuer's other certifying officer and I used to design the issuer's ICFR is *Internal Control — Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission.

5.2 *N/A*

5.3 *N/A*

6. *Reporting changes in ICFR:* The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2011 and ended on March 31, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

56.     On a conference call discussing the results for the third fiscal quarter ending

September 30, 2011, Defendant Engel stated, in relevant part, the following:

> Now but you get more details on each of these products and milestones. First, perifosine,
> our novel oral anticancer Akt inhibitor. Recruitment of 468 patients, exceeding the
> original target of 430 patients, was completed by our North American partner Keryx
> within 16 months time line. As a reminder, the Phase 3 registration (inaudible) trial is a
> double blind placebo controlled trial comparing the efficacy and safety of perifosine plus
> Xeloda versus placebo plus Xeloda in patients with refractory advanced colorectal
> cancer.
>
> The primary endpoint is overall survival. The trial is conducted under a special protocol
> assessment and has received fast-track designation from the FDA and positive scientific
> advice from the European Medicines Agency. Furthermore, a Data Safety Monitoring
> Board analysis to evaluate the safety and futility was completed in late August which
> recommended that the Phase 3 study continue to completion as planned.
>
> The study is being conducted in 65 sites in the US and 360 events or deaths will trigger
> the unblinding of the data. We expect the 360 event to occur in the first quarter of 2012.
> Our intention is to file an MAA for perifosine in Europe in the first half of 2012 in
> parallel with Keryx's filing of the NDA in the US.

57.     The aforementioned statements in ¶¶ 54 - 56 were false and/or materially

misleading when made because Defendants knew or recklessly disregarded that the Phase 3 X-

PECT study would be completed later than the second half of 2011 even if perifosine was

ineffective in meeting the primary endpoint of extending overall survival.

58.     On January 24, 2012, the Company filed with the SEC a second supplemental

prospectus to the July 2010 Shelf Prospectus which announced an "At-The-Market" (ATM) sales

agreement to sell up to a maximum of 10,400,000 of the Company's common shares.

59.     On March 28, 2012, the Company filed Form 20-F ("2012 20-F") with the SEC

announcing its financial results for the full fiscal year ending December 31, 2011.  On a

conference call discussing the results for the full fiscal year ending December 31, 2011,

Defendant Engel stated, in relevant part, the following:

> [Q – Analyst]  And then when we talk about the timing of the perifosine data, you
> mentioned in the next several weeks but just trying to nail it down maybe a little bit more.

24

I'm assuming that the events still haven't occurred and are supposed to occur in the next few weeks. How long do you think the data lock down and announcement of the results might be?

[A – Jürgen Engel] I like to repeat was – our friends from Keryx mentioned the – we still expect to have the 360 events happen in March and from there within a period of four to six weeks we will have the top line results available, within a period of four to six weeks.

60.     The 2012 20-F was also certified by Defendants Engel and Turpin, whom

respectively attested to the following:

1. I have reviewed this annual report on Form 20-F of Aeterna Zentaris Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as at, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as at the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

61.     Additionally, Defendants Engel and Turpin certified under Section 906 of the Sarbanes-Oxley Act of 2002 that the "information contained in the [20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

62.     The aforementioned statement in ¶¶ 59 - 61 were false and/or materially misleading when made since Defendants received a free flow of data from Keryx on the progress of the Phase 3 X-PECT trial and therefore knew or recklessly disregarded (1) that the 360 death occurred before the end of March 2012 and (2) that perifosine was not effective at treating colorectal cancer.

**THE TRUTH EMERGES**

63.     On April 2, 2012, only four days after filing its 2012 20-F, the Company shocked the market by issuing a press release that announced, in part, the following:

**Aeterna Zentaris Announces Top-Line Data from the Perifosine Phase 3 Trial in Refractory Advanced Colorectal Cancer**

QUÉBEC CITY, April 2, 2012 /CNW Telbec/ - Aeterna Zentaris Inc. (NASDAQ: AEZS) (TSX: AEZ) (the "Company") today announced that the Phase 3 "X-PECT" (Xeloda® +

26

Perifosine Evaluation in Colorectal cancer Treatment) clinical trial evaluating perifosine + capecitabine (Xeloda®) in patients with refractory advanced colorectal cancer did not meet the primary endpoint of improving overall survival versus capecitabine + placebo. The trial involving 468 patients in 65 sites in the U.S was conducted by the Company's North American licensee partner, Keryx Biopharmaceuticals, Inc. (NASDAQ: KERX).

64.     On this news, the Company's common stock declined $1.44 per share, or approximately 67%, to close on April 2, 2012 at $0.73 per share, on unusually heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     As a result of Defendants misleading and/or false statements regarding the true efficacy of perifosine in treating colorectal cancer, the Company was able to generate proceeds in excess of $36 million through the aforementioned ATM sales agreements.  In fact, the 2012 20-F revealed, in relevant part, the following:

> Mr. Turpin's 2011 goals were aligned with the Company's overall objectives, with an emphasis on supporting attainment of the financial objectives. Based upon results achieved, the Governance Committee determined that Mr. Turpin's individual performance exceeded expectations as follows: completed two successful At-the-Market Financings (ATMs) generating proceeds in excess of $36 million as a consequence of which the Company completed 2011 with cash and cash equivalents exceeding significantly the budget amount, and contributed significantly to the achievement of the Company's various goals set in the area of Investor Relations. The Compensation Committee determined that Mr. Turpin's contributions to the achievement of the Company's goals merited a cash bonus in an amount of $80,509 and an equity-based bonus in an amount of $34,125 paid through the granting of 34,125 stock options based on 2011 performance.

## LOSS CAUSATION

66.     At all relevant times, AEterna's stock was traded on the NASDAQ GM.  As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for AEterna's stock.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by

maintaining and supporting a false positive perception of AEterna's business, operations, performance and prospects.

67.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial and operational condition or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was materially misleading to the market.  As a result of their failure to do so, the price of AEterna securities were artificially inflated during the Class Period, directly causing Plaintiff and the Class to suffer damages when the truth eventually emerged.

68.     Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period directly caused losses to Plaintiff and the Class.  On the strength of these false statements, the Company's stock price was artificially inflated to a Class Period high of $2.68 per share on April 29, 2011.

69.     As the truth began to emerge regarding the true nature of the efficacy of perifosine in treating colorectal cancer, the price of AEterna stock declined as the market processed each set of previously undisclosed facts.  Each such disclosure removed a portion of the artificial inflation in the price of AEterna's securities and directly caused Plaintiff and other Class members to suffer damages.  On April 2, 2012, AEterna's stock had declined to a close of $0.73 per share -- a decline of approximately 73% per share from its Class Period high.

70.     Until shortly before Plaintiff filed this Complaint, he was unaware of the facts alleged herein and could not have reasonably discovered the Defendants' misrepresentations and omissions by the exercise of reasonable diligence.

## APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

71.     At all relevant times, the market for AEterna's securities was an efficient market for the following reasons, among others:

a.  AEterna's stock was listed and actively traded on the NASDAQ
    GM, a highly efficient national market;

b.  As a registered and regulated issuer of securities, AEterna filed
    periodic reports with the SEC, in addition to the frequent voluntary
    dissemination of information;

c.  AEterna regularly communicated with public investors through
    established market communication mechanisms, including through
    regular dissemination of press releases on the national circuits of
    major newswire services and through other wide-ranging public
    disclosures such as communications with the financial press and
    other similar reporting services;

d.  AEterna was followed by multiple analysts, which followed
    AEterna's business and wrote reports which were publicly available
    and affected the public marketplace;

e.  The material misrepresentations and omissions alleged herein
    would tend to induce a reasonable investor to misjudge the value of
    AEterna's stock; and

f.  Without knowledge of the misrepresented or omitted facts, Plaintiff
    and other members of the Class purchased or otherwise acquired
    AEterna stock between the time the Defendants made the material
    misrepresentations and omissions and the time that the truth was
    revealed, during which time the price of AEterna stock was
    artificially inflated by Defendants' misrepresentations and
    omissions.

72.     As a result of the above, the market for AEterna securities promptly digested

current information with respect to the Company from all publicly available sources and

reflected such information in the security's price.  Under these circumstances, all purchasers of

AEterna securities during the Class Period suffered similar injuries through their purchases of

shares at prices which were artificially inflated by the Defendants' misrepresentations and

omissions.  Thus, a presumption of reliance applies.

**NO SAFE HARBOR**

73.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

29

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made and/or were statements of historical fact. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AEterna who knew that those statements were false when made.

## FIRST CAUSE OF ACTION
### (Violation of Section 10(b) an Rule 10b-5)

74.     Plaintiff realleges each allegation above as if fully set forth herein.

75.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against AEterna and the Individual Defendants (the "Section 10(b) Defendants"). The Section 10(b) Defendants (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material

30

information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

77.     The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

78.     As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff was misled into believing that the Company's financial statements were true, accurate, and complete.

79.     Plaintiff purchased AEterna securities without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In purchasing the stock, Plaintiff relief directly or indirectly on false and misleading statements made by the Section 10(b) Defendants, and/or an absence of material adverse information that was known to Section 10(b) Defendants or recklessly disregarded by them but not disclosed in the Section 10(b) Defendants' public statements.  Plaintiff was damaged as a result of his reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

80.     At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true.  Plaintiff would not otherwise have purchased or acquired AEterna securities had he known the truth about the matters discussed above.

81.     Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claim, and within five years after the violations with respect to Plaintiff's investments.

82.     By virtue of the foregoing, the Section 10(b) Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff has suffered damages in connection with the purchase of AEterna securities.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Exchange Act)

84.     Plaintiff realleges each allegation above as if fully set forth herein.

85.     Each of the Individual Defendants, by reason of his status as a senior executive, officer, controlling shareholder and/or director of AEterna, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff, within the meaning of § 20(a) of the Exchange Act (the "Section 20(a) Defendants").  The Section 20(a) Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's investments in AEterna securities within the meaning of § 20(a) of the Exchange Act.  Therefore, the Section 20(a) Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

86.     The Section 20(a) Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Section 20(a) Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

87.     The Section 20(a) Defendants knew or recklessly disregarded the fact that AEterna's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Section 20(a) Defendants did not act in good faith.

88.     By virtue of their high-level positions and their participation in and awareness of AEterna's operations and public statements, the Section 20(a) Defendants were able to and did influence and control AEterna's decision-making, including controlling the content and dissemination of the documents that Plaintiff contends contained materially false and misleading information and on which Plaintiff relied.

89.     The Section 20(a) Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

90.     As set forth above, the Section 10(b) Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the Exchange Act.

91.     As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchases of AEterna securities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for relief and judgment including:

A.     Determining that Counts I and II of this action is a proper class action under Federal Rules of Civil Procedure 23, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Lead Counsel;

      B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

      C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited to, rescission);

      D.      Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

      E.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  New York, NY
        June 15, 2012

                    **FARUQI & FARUQI LLP**

                    Richard W. Gonnello
                    Francis P. McConville
                    369 Lexington Avenue, 10th Floor
                    New York, NY 10017
                    Tel: (212) 983-9330
                    Fax: (212) 983-9331
                    E-mail: rgonnello@faruqilaw.com
                              fmcconville@faruqilaw.com

                    -and-

                    Emily C. Komlossy
                    3595 Sheridan Street, Suite 206
                    Hollywood, Florida 33021
                    Tel: 954-239-0280

Fax: 954-239-0281
Email: ekomlossy@faruqilaw.com

*Counsel for Plaintiff Charles Austin*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Charles Austin ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a complaint against Aeterna Zentaris Inc. and has authorized its filing.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Aeterna Zentaris Inc.'s securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 14th day of June 2012.

_____
Charles Austin

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 11/24/2010 | 1.35 | 2350 |
| Purchase | 11/29/2010 | 1.38 | 5000 |
| Purchase | 12/9/2010 | 1.48 | 1100 |
| Purchase | 12/23/2010 | 1.78 | 300 |
| Purchase | 12/23/2010 | 1.79 | 100 |
| Purchase | 12/23/2010 | 1.79 | 100 |
| Purchase | 12/23/2010 | 1.79 | 100 |
| Purchase | 12/23/2010 | 1.79 | 550 |
| Purchase | 12/27/2010 | 1.858 | 1100 |
| Purchase | 12/30/2010 | 1.75 | 100 |
| Purchase | 12/30/2010 | 1.75 | 100 |
| Purchase | 12/30/2010 | 1.75 | 100 |
| Purchase | 12/30/2010 | 1.75 | 100 |
| Purchase | 12/30/2010 | 1.75 | 100 |
| Purchase | 12/30/2010 | 1.76 | 100 |
| Purchase | 12/30/2010 | 1.76 | 800 |
| Purchase | 1/11/2011 | 1.718 | 750 |
| Purchase | 1/21/2011 | 1.568 | 875 |
| Purchase | 1/27/2011 | 1.688 | 1050 |
| Purchase | 2/10/2011 | 1.778 | 1100 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 200 |
| Purchase | 2/17/2011 | 1.71 | 600 |
| Purchase | 2/17/2011 | 1.71 | 52 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 48 |
| Purchase | 2/17/2011 | 1.71 | 52 |

|  | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 2/17/2011 | 1.71 | 48 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 100 |
| Purchase | 2/17/2011 | 1.71 | 500 |
| Purchase | 2/17/2011 | 1.709 | 2200 |
| Purchase | 2/28/2011 | 1.86 | 1700 |
| Purchase | 3/10/2011 | 1.855 | 100 |
| Purchase | 3/10/2011 | 1.856 | 100 |
| Purchase | 3/10/2011 | 1.857 | 100 |
| Purchase | 3/10/2011 | 1.857 | 100 |
| Purchase | 3/10/2011 | 1.859 | 100 |
| Purchase | 3/10/2011 | 1.859 | 100 |
| Purchase | 3/10/2011 | 1.86 | 100 |
| Purchase | 3/10/2011 | 1.86 | 800 |
| Purchase | 3/10/2011 | 1.86 | 200 |
| Purchase | 3/10/2011 | 1.86 | 100 |
| Purchase | 3/10/2011 | 1.86 | 100 |
| Purchase | 3/10/2011 | 1.86 | 200 |
| Purchase | 3/10/2011 | 1.86 | 100 |
| Purchase | 3/10/2011 | 1.86 | 100 |
| Purchase | 3/10/2011 | 1.859 | 925 |
| Purchase | 3/17/2011 | 1.773 | 200 |
| Purchase | 3/17/2011 | 1.773 | 100 |
| Purchase | 3/17/2011 | 1.773 | 100 |
| Purchase | 3/17/2011 | 1.773 | 100 |
| Purchase | 3/17/2011 | 1.774 | 100 |
| Purchase | 3/17/2011 | 1.775 | 100 |
| Purchase | 3/17/2011 | 1.776 | 600 |

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 3/17/2011 | 1.776 | 100 |
| Purchase | 3/17/2011 | 1.779 | 100 |
| Purchase | 3/17/2011 | 1.779 | 1650 |
| Purchase | 3/24/2011 | 1.783 | 100 |
| Purchase | 3/24/2011 | 1.783 | 100 |
| Purchase | 3/24/2011 | 1.783 | 100 |
| Purchase | 3/24/2011 | 1.783 | 200 |
| Purchase | 3/24/2011 | 1.783 | 100 |
| Purchase | 3/24/2011 | 1.783 | 100 |
| Purchase | 3/24/2011 | 1.783 | 300 |
| Purchase | 3/24/2011 | 1.79 | 200 |
| Purchase | 3/24/2011 | 1.79 | 100 |
| Purchase | 3/24/2011 | 1.789 | 850 |
| Sale | 6/15/2011 | 2.21 | 3100 |
| Sale | 6/15/2011 | 2.21 | 160 |
| Sale | 6/15/2011 | 2.21 | 140 |
| Sale | 6/15/2011 | 2.21 | 800 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Sale | 6/15/2011 | 2.21 | 1100 |
| Sale | 6/15/2011 | 2.21 | 1100 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Sale | 6/15/2011 | 2.21 | 100 |
| Purchase | 7/12/2011 | 2.359 | 2100 |
| Purchase | 8/4/2011 | 1.729 | 2000 |
| Purchase | 8/11/2011 | 1.639 | 2150 |

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 8/15/2011 | 1.859 | 1100 |
| Purchase | 10/27/2011 | 1.61 | 600 |
| Purchase | 10/27/2011 | 1.609 | 3100 |
| Purchase | 11/8/2011 | 1.519 | 1300 |
| Purchase | 12/22/2011 | 1.549 | 4100 |
| Purchase | 1/19/2012 | 1.698 | 2100 |
| Purchase | 1/24/2012 | 1.548 | 2000 |
| Purchase | 2/2/2012 | 1.75 | 2000 |
| Purchase | 3/5/2012 | 2.11 | 4300 |
| Purchase | 3/5/2012 | 2.11 | 2700 |
| Purchase | 3/5/2012 | 2.11 | 600 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 300 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 500 |
| Purchase | 3/5/2012 | 2.11 | 600 |
| Purchase | 3/5/2012 | 2.11 | 500 |
| Purchase | 3/5/2012 | 2.11 | 500 |
| Purchase | 3/5/2012 | 2.11 | 500 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 300 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 800 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 200 |

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.11 | 300 |
| Purchase | 3/5/2012 | 2.11 | 100 |
| Purchase | 3/5/2012 | 2.11 | 200 |
| Purchase | 3/5/2012 | 2.1 | 3900 |
| Purchase | 3/5/2012 | 2.1 | 1006 |
| Purchase | 3/5/2012 | 2.1 | 894 |
| Purchase | 3/5/2012 | 2.1 | 500 |
| Purchase | 3/5/2012 | 2.1 | 500 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 100 |
| Purchase | 3/5/2012 | 2.1 | 994 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 900 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 1300 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 500 |
| Purchase | 3/5/2012 | 2.1 | 300 |
| Purchase | 3/5/2012 | 2.1 | 6 |
| Purchase | 3/5/2012 | 2.1 | 200 |
| Purchase | 3/5/2012 | 2.1 | 500 |
| Purchase | 3/5/2012 | 2.1 | 100 |

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 3/5/2012 | 2.09 | 9100 |
| Purchase | 3/5/2012 | 2.09 | 440 |
| Purchase | 3/28/2012 | 2 | 100 |
| Purchase | 3/28/2012 | 2 | 100 |
| Purchase | 3/28/2012 | 2 | 2900 |
| Purchase | 3/28/2012 | 2.01 | 100 |
| Purchase | 3/28/2012 | 2 | 1100 |
| Purchase | 3/28/2012 | 2 | 10000 |
| Purchase | 3/28/2012 | 2.01 | 300 |
| Purchase | 3/28/2012 | 2.01 | 200 |
| Purchase | 3/28/2012 | 2.01 | 100 |
| Purchase | 3/28/2012 | 2.01 | 200 |
| Purchase | 3/28/2012 | 2.01 | 100 |
| Purchase | 3/28/2012 | 2.01 | 4300 |
| Purchase | 3/29/2012 | 2.05 | 3200 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |